# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| O'Brien Construction, Inc., | Case No. 1:19cv1451 |
| **Plaintiff,** | |
| -vs- | **JUDGE PAMELA A. BARKER** |
| Michael Miller,<br>dba Pro-Electric | **MEMORANDUM OPINION AND ORDER** |
| **Defendant** | |

Currently pending are Defendant Michael Miller dba Pro-Electric's (1) Motion to Transfer Venue (Doc. No. 13); and (2) Motion to Dismiss for Failure to State a Claim for Relief under Fed. R. Civ. P. 12(b)(6), Lack of Subject-Matter Jurisdiction under Fed. R. Civ. P. 12(b)(1), and Lack of Personal Jurisdiction under Fed. R. Civ. P. 12(b)(2) (Doc. No. 14.)  Plaintiff O'Brien Construction, Inc. filed Briefs in Opposition (Doc. Nos. 16, 17), to which Defendant responded (Doc. Nos. 18, 19.)

For the following reasons, Defendant's Motion to Dismiss (Doc. No. 14) is GRANTED to the extent it seeks dismissal on the basis of lack of personal jurisdiction; and DENIED AS MOOT to the extent it seeks dismissal for lack of subject matter jurisdiction and failure to state a claim. Defendant's Motion to Transfer Venue (Doc. No. 13) is DENIED AS MOOT.

## I.  Procedural Background

On June 24, 2019, Plaintiff O'Brien Construction, Inc. filed a Complaint against Defendant Michael Miller dba Pro-Electric, asserting claims for (1) a violation of the Lanham Act, 15 U.S.C. § 1125(a)(1); (2) fraud in the execution/fraud in the factum; (3) tortious interference; (4) rescission;

and (5) declaratory judgment. (Doc. No. 1.) Defendant filed Motions to Dismiss and to Transfer Venue on July 31, 2019. (Doc. Nos. 8, 9.)

Thereafter, on August 14, 2019, Plaintiff filed an Amended Complaint against Defendant, asserting the same five claims. (Doc. No. 10.) Plaintiff attached several Exhibits to this Complaint, including copies of the Master Subcontract Agreement that was proposed by Plaintiff; the Master Subcontract Agreement that was ultimately signed by the parties; the parties' Subcontract Agreement; and several emails between Plaintiff and Defendant from early 2019. (Doc. Nos. 10-1 through 10-5.) Defendant's previously filed Motion to Dismiss was denied as moot, and his Motion to Transfer Venue was denied without prejudice. (Doc. No. 11.)

On August 19, 2019, Defendant filed a Motion to Dismiss for Failure to State a Claim for Relief under Fed. R. Civ. P. 12(b)(6), Lack of Subject-Matter Jurisdiction under Fed. R. Civ. P. 12(b)(1), and Lack of Personal Jurisdiction under Fed. R. Civ. P. 12(b)(2), and Memorandum in Support. (Doc. Nos. 14, 15.) On that same date, he also filed a Motion to Transfer Venue. (Doc. No. 13.) Plaintiff filed Briefs in Opposition on September 3, 2019, to which Defendant replied. (Doc. Nos. 16, 17, 18, 19.)

**II.  Factual Allegations**

Plaintiff is an Ohio corporation with its principal place of business in Solon, Ohio. (Doc. No. 10 at ¶ 1.) At all times relevant herein, Plaintiff was a general contractor for a project known as the Ross Monroe Marketplace, located in Selinsgrove, Pennsylvania (hereinafter referred to as "the Construction Project"). (*Id*. at ¶ 6.)

Defendant is an individual residing in Pennsylvania. (*Id*. at ¶¶ 2, 3.) He is an electrical contractor doing business as Pro-Electric. (*Id*. at ¶¶ 2, 14.) In an affidavit attached to his Motion to

2

Dismiss, Defendant asserts that he does not (1) reside in Ohio; (2) transact any business in Ohio; (3) contract to supply services or goods in Ohio; (4) regularly solicit business in Ohio; (5) derive any substantial revenue from goods used or consumed, or services rendered, in Ohio; (6) own or have an interest in any real estate in Ohio; or (7) contract to insure any person, property or risk in Ohio. (Doc. No. 14-1 at ¶¶ 30-38.)

In December 2018, Plaintiff solicited Defendant to bid on the Construction Project. (Doc. No. 14-1 at ¶¶ 5-6.) Defendant submitted a bid for the project to Plaintiff in Ohio through either email or the internet. (*Id*. at ¶ 7.)

On February 6, 2019, Plaintiff presented Defendant with Plaintiff's standard "Master Subcontract Agreement for January 2019 through December 2019," as well as a separate Subcontract Agreement.[1] (Doc. No. 10 at ¶¶ 14-15.) *See also* Doc. No. 10-1, 10-2, 10-3. Plaintiff did so via the use of Redteam Software, "which is a cloud-based construction project management software for contractors whereby O'Brien shares documents and agreements with third-parties for review and electronic signature." (*Id*. at ¶ 16.) According to Plaintiff, Redteam does not permit third-parties to modify or amend proposed agreements. (*Id*. at ¶ 17.) Instead, parties seeking to amend proposed agreements must utilize the Redteam "comment" tool that accompanies proposed agreements. (*Id*.)

The Standard Master Subcontract Agreement that Plaintiff sent to Defendant is written on O'Brien letterhead, which contains O'Brien's tradename and trademark (hereinafter referred to as the "OCI Mark"). (Doc. No. 10 at ¶ 9.) Plaintiff asserts that "the O'Brien tradename has been used by O'Brien continuously since 1999 in connection with O'Brien's general contracting services

---

[1] Hereinafter, the Court will refer to the standard Master Subcontract Agreement for January 2019 through December 2019 that was sent to Defendant on February 6, 2019 as the "Standard Master Subcontract Agreement." The Court will refer to the separate Subcontract Agreement simply as "the Subcontract Agreement."

3

throughout the United States and the O'Brien trademark has been used by O'Brien for at least the past 4 years." (*Id*.) Plaintiff further alleges that it "has expended substantial time, money, and resources marketing, advertising, and promoting the services sold under the OCI Mark." (*Id*. at ¶ 12.)

The Standard Master Subcontract Agreement referenced and incorporated a Subcontract Agreement dated February 6, 2019, which set forth the statement of work and schedule of values for the Construction Project. (*Id*. at ¶ 15.) The "statement of work" included providing temporary lighting and outlets, providing and installing a complete building automation system, providing and installing the main distribution for all cash register modules, installing light fixtures, providing and installing an energy management system, wiring thermostats for exhaust vents, and completing a fire alarm system. (Doc. No. 10-3 at PageID# 118.) The Subcontract Agreement specified that work was to be substantially completed on June 25, 2019. (*Id*.) The contract amount totaled $266,231.56. (*Id*.) *See also* Doc. No. 10 at ¶ 15.

In the email forwarding the Standard Master Subcontract Agreement and Subcontract Agreement, Plaintiff states, in relevant part, as follows: "Proceed as instructed in your LOI (Letter of Intent). Do not proceed with any other work until OCI [i.e., Plaintiff] issues an official NTP (Notice to Proceed)." (Doc. No 10-1 at PageID# 106.) Before executing the Subcontract Agreement, Defendant states that he "discussed the terms with Plaintiff's employees or agents through the phone or by email." (Doc. No. 14-1 at ¶ 10.) Defendant signed the Subcontract Agreement on February 9, 2019 while in Pennsylvania. (*Id*. at ¶ 9.) The record reflects Plaintiff signed the Subcontract Agreement several weeks later, on February 28, 2019. (Doc. No. 10-3 at PageID# 119.)

After signing the Subcontract Agreement, Defendant avers that he "promptly commenced [his] performance under the Subcontract." (Doc. No. 14-1 at ¶ 12.) He states that "[d]uring my

4

performance under the Subcontract, there were change orders modifying the scope of work and the total price for my services." (*Id*.)

With regard to the Master Subcontract Agreement, Defendant avers as follows:

13. Plaintiff had also forwarded to me by e-mail a "Master Subcontract Agreement January 1, 2019 through December 31, 2019" (the "Proposed Master Agreement") being the same document as Exhibit 1 to Plaintiff's Complaint. This Proposed Master Agreement was not signed by Plaintiff when it was submitted to me at the time I began performing under the Subcontract. The Proposed Master Agreement struck me as very one-sided in favor of Plaintiff. I especially wanted dispute resolution to be in the Commonwealth of Pennsylvania and for our contractual relationship to be governed by Pennsylvania law. I also wanted to include other terms which I believed were fairer.

14. I was allowed to begin work under the Subcontract, even though I had not yet signed the Proposed Master Agreement, and I perceived this as increasing my bargaining position because it would have been too cumbersome and would have caused delay if Plaintiff were to terminate the Subcontract and give the work to someone else.

15. By e-mail dated April 29, 2019, I submitted to Plaintiff a form of that same document containing revised terms, based on what I wanted for inclusion (the "Signed Master Agreement"), being the same document as Exhibit 2 in Plaintiff's Complaint.

\*\*\*

16. I signed the Signed Master Agreement while in the Commonwealth of Pennsylvania. \*\*\*

(Doc. No. 14-1 at ¶¶ 13-16.) The Court will hereinafter refer to the signed version of the agreement that Defendant sent to Plaintiff in April 2019 as the "Signed Master Subcontract Agreement." In the email that accompanied the Signed Master Subcontract Agreement, Defendant stated as follows: "Hi I have attached all paperwork and signed to date please send back a copy from [sic] this of singed [sic] by your company for records as well Thanks." (Doc. No. 10-4 at PageID# 120.)

Plaintiff notes that, in that email, Defendant did not indicate that he had made any proposed changes to the Standard Master Subcontract Agreement. (Doc. No. 10 at ¶ 19.) Further, Defendant

5

did not use the "comment" tool via Redteam to alert Plaintiff to any changes that he proposed to the Standard Master Subcontract Agreement. (*Id*. at ¶ 21.) Instead, Defendant "copied the [Standard Master Subcontract Agreement], modified it significantly, executed it, and returned it to O'Brien." (*Id*.) Plaintiff claims that all of Defendant's revisions were material to the transaction and none were "requested, adopted, or authorized by O'Brien." (*Id*. at ¶¶ 22, 24.) Moreover, Plaintiff alleges that "Defendant made all the revisions in such a way as to preserve the appearance that it was returning the [Standard Master Subcontract Agreement], by misappropriating the OCI Trademark, adopting the same type face, fonts, formatting, page numbers, line spacing, and paragraph location." (*Id*. at ¶ 23.)

In sum, Plaintiff claims that that "Defendant surreptitiously revised the [Standard Master Subcontract Agreement] without bargaining for the revisions and/or affirmatively disclosing the revisions to O'Brien, on information and belief, with the specific intent to defraud O'Brien into executing the [Signed Master Subcontract Agreement], thereby entering into a contractual relationship on terms more favorable to Defendant." (*Id*. at ¶ 25.) Plaintiff executed the Signed Mater Subcontract Agreement on April 29, 2019. (Doc. No. 10-5 at PageID# 126.)

Shortly thereafter, on May 1, 2019, Defendant avers that Plaintiff's project manager "communicated to me and other subcontractors a 'Stop Work Order' as to the Construction Project by a purported owner." (Doc. No. 14-1 at ¶ 19.) Plaintiff indicated an anticipated remobilization date of May 13, 2019; however, Defendant states that (as of the date of his Affidavit) he has not received a request to resume performance. (*Id*.) Defendant further avers that he has "received no payments from Plaintiff under the Subcontract, and my repeated requests for payment have been rebuffed by

6

Plaintiff." (*Id*. at ¶ 20.) Lastly, Defendant asserts that "nothing in my performance under the Subcontract involved travel to the State of Ohio."[2] (*Id*. at ¶ 27.)

**III.    Analysis**

Defendant seeks dismissal under Fed. R. Civ. P. 12(b)(1), 12(b)(2) and 12(b)(6). First, Defendant argues that the Amended Complaint should be dismissed for lack of personal jurisdiction under Rule 12(b)(2) because Plaintiff has failed to establish the existence of either general or specific jurisdiction. Assuming there is personal jurisdiction, Defendant next argues that all five claims should be dismissed for failure to state a claim pursuant to Rule 12(b)(6). Lastly, Defendant argues that, if this Court dismisses Plaintiff's Lanham Act claim, Plaintiff's remaining state law claims should be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction because they fail to meet the amount in controversy requirement for diversity jurisdiction.

The Court will begin, as it must, with the threshold issue of personal jurisdiction.[3]  *See Steel Co v. Citizens for a Better Env't,* 523 U.S. 83, 93-95 (1998) (stating that "the requirement that

---

[2] Defendant further avers that, on June 4, 2019, he submitted (through counsel) a Notice of Intent to File Mechanics' Lien Claim under Pennsylvania law pursuant to 49 P.S. 1501, to Plaintiff and several other entities associated with the Construction Project. *(Id*. at ¶ 21.) On that same date, Defendant submitted a Demand for Arbitration against Plaintiff with the American Arbitration Association ("AAA"). (*Id*. at ¶ 22.) Two weeks later, on June 21, 2019, Plaintiff filed an Objection to Arbitration and requested that Defendant withdraw his Demand. (*Id*. at ¶ 23.) Defendant complied and withdrew his Demand for Arbitration on June 24, 2019. (*Id*. at ¶ 24.) Plaintiff filed the instant action the same day. (*Id*.) Four days later, on June 28, 2019, Defendant invoked his rights to suspend performance until payments have been resolved, by mailing a Notice of Intent to Suspend Performance pursuant to Pennsylvania's Contractor and Subcontractor Payment Act, 73 P.S. 507. (*Id*. at ¶ 26.)

[3] Defendant has also filed a Motion to Transfer Venue. (Doc. No. 13.) A district court's authority to transfer venue is based on two statutes, 28 U.S.C. § 1404(a) and § 1406(a). As the Sixth Circuit has explained, Section 1404(a) permits a change of venue for the convenience of parties and witnesses, while Section 1406(a) allows a district court to grant a change of venue when venue is improper in the original forum. *Pittock v. Otis Elevator Co*., 8 F.3d 325, 329 (6th Cir. 1993). A transfer of venue under Section 1404(a) may not be granted when the district court does not have personal jurisdiction over the defendants; Section 1406(a), however, does not require that the district court have personal jurisdiction before transferring the case. *Id. See also Costaras v. NBC Universal, Inc*., 409 F.Supp.2d 897, 901 (N.D. Ohio Dec. 16, 2005). Here, the statutory basis of Defendant's Motion is unclear. In the first and last sentences of the Motion, Defendant refers to Section 1406(a). (Doc. No. 13 at p. 1, 3.) In the body of the Motion, Defendant purports to cite the legal standard for transfer of venue under Section 1404(a) but, in fact, recites the standard for *forum non*

7

jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception"); *Bird v. Parsons*, 289 F.3d 865, 872 (6th Cir. 2002) (explaining that courts must first decide whether personal jurisdiction exists over defendants before proceeding to the merits of the case); *Friedman v. Estate of Presser*, 929 F.2d 1151, 1156 (6th Cir. 1991) ("Without personal jurisdiction over an individual, however, a court lacks all jurisdiction to adjudicate that party's rights, whether or not the court has valid subject matter jurisdiction.").

Plaintiff bears the burden of proving personal jurisdiction. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). If a court rules on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction prior to trial, "it has the discretion to adopt any of the following courses of action: (1) determine the motions based on affidavits alone; (2) permit discovery, which would aid in resolution of the motion; or (3) conduct an evidentiary hearing on the merits of the motion." *Intera Corp. v. Henderson*, 428 F.3d 605, 614 n.7 (6th Cir. 2005). "[T]he decision whether to grant discovery or an evidentiary hearing before ruling on a 12(b)(2) motion is discretionary." *Burnshire Dev., LLC v. Cliffs Reduced iron Corp.*, 198 Fed. Appx. 425, 434 (6th Cir. 2006).

When a district court rules on a jurisdictional motion to dismiss made pursuant to Rule 12(b)(2) without conducting an evidentiary hearing, as is the case here, the court must consider the pleadings and affidavits in a light most favorable to the plaintiff. *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996). To defeat such a motion, a plaintiff need only make a *prima facie* showing of jurisdiction, which can be met by "establishing with reasonable particularity sufficient

---

*conveniens*, which is similar to but distinct from Section 1404(a). *See Jones v. IPX International Equatorial Guinea, S.A.*, 920 F.3d 1085, 1090 (6th Cir. 2019). In light of this confusion, the Court will err on the side of caution and determine the issue of personal jurisdiction before reaching Defendant's Motion to Transfer Venue.

contacts between the defendant and the forum state to support jurisdiction." *Neogen Corp. v. Neo Gen Screening, Inc.,* 282 F.3d 883, 887 (6th Cir. 2002). A court disposing of a Rule 12(b)(2) motion does not weigh the controverting assertions of the party seeking dismissal but may consider a defendant's undisputed factual assertions. *See CompuServe*, 89 F.3d at 1262; *Theunissen*, 935 F.2d at 1459; *NTCH-West Tenn, Inc., v. ZTE Corp.*, 761 Fed. Appx. 485, 488 (6th Cir. Jan. 16, 2019) (citing *Kerry Steel, Inc. v. Paragon Industries, Inc.*, 106 F.3d 147, 153 (6th Cir. 1997)). "Dismissal in this procedural posture is proper only if all the specific facts which the plaintiff . . . alleges collectively fail to state a *prima facie* case for jurisdiction." *Id*. *See also Kerry Steel, Inc.,* 106 F.3d at 149.

"Where a federal court's subject matter jurisdiction over a case stems from the existence of a federal question, personal jurisdiction over a defendant exists 'if the defendant is amenable to service of process under the [forum] state's long-arm statute and if the exercise of personal jurisdiction would not deny the defendant[ ] due process.'" *Bird*, 289 F.3d at 871 (quoting *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 954 F.2d 1174, 1176 (6th Cir.1992)). Because "Ohio's long-arm statute is not coterminous with federal constitutional limits," to establish a *prima facie* case of personal jurisdiction, a plaintiff must demonstrate both that (1) Ohio's long-arm statute has been satisfied and (2) exercising jurisdiction would comport with Due Process. *Schneider v. Hardesty*, 669 F.3d 693, 699 (6th Cir. 2012) (quoting *Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 361 (6th Cir. 2008)); *Kauffman Racing Equip., LLC v. Roberts*, 930 N.E.2d 784, 790 (Ohio 2010)). "[I]f jurisdiction is not proper under the Due Process Clause, it is unnecessary to analyze jurisdiction under the state long-arm statute, and vice-versa."

*Conn v. Zakharov*, 667 F.3d 705, 711-712 (6th Cir. 2012). *See also Filtrexx International, LLC v. Truelsen*, 2013 WL 587582 at * 7 (N.D. Ohio Feb. 13, 2013).

For the reasons set forth below, the Court finds that jurisdiction is not proper under the Due Process Clause. Thus, the Court will confine its analysis to that issue, and need not reach the parties' arguments regarding Ohio's long-arm statute.

### A. Due Process Clause

As the Sixth Circuit has explained, "there are two kinds of personal jurisdiction within the Due Process inquiry," i.e., general jurisdiction and specific jurisdiction. *Conn*, 667 F.3d at 713. General jurisdiction requires a showing that the defendant has continuous and systematic contacts with the forum state sufficient to justify the state's exercise of judicial power with respect to any and all claims the plaintiff may have against the defendant, whereas specific jurisdiction exposes the defendant to suit in the forum state only on claims that "arise out of or relate to" a defendant's contacts with the forum. *Kerry Steel, Inc.*, 106 F.3d at 149 (citing *Helicopteros Nacionales de Colombia S.A., v. Hall,* 466 U.S. 408, 414–415 & fns. 8–10 (1984) and *Third Nat'l Bank in Nashville v. WEDGE Group, Inc.*, 882 F.2d 1087, 1089 (6th Cir. 1989)).

Here, Defendant argues that general jurisdiction does not exist because "he is a non-resident who does not transact business here." (Doc. No. 15 at p. 16.) Plaintiff does not address or oppose Defendant's arguments regarding general jurisdiction and, instead, limits its argument to the issue of specific personal jurisdiction. Thus, and in the absence of any opposition on the issue, the Court finds that general jurisdiction does not exist and will limit its analysis to the question of whether Plaintiff has made a *prima facie* showing of specific jurisdiction over Defendant.

In making this determination, "the crucial federal constitutional inquiry is whether, given the facts of the case, the nonresident defendant has sufficient contacts with the forum state that the district court's exercise of jurisdiction would comport with 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). *See also CompuServe*, 89 F.3d at 1263; *Theunissen*, 935 F.2d at 1459. The Sixth Circuit has established the following three-part test for determining whether specific personal jurisdiction exists:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum to make the exercise of jurisdiction over the defendant reasonable.

*CompuServe, Inc.*, 89 F.3d at 1263. *See also Calphalon v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000); *Southern Mach. Co. v. Mohasco Indus.*, 401 F.2d 374, 381 (6th Cir. 1968).

### 1. Purposeful Availment

The question of whether a defendant has purposefully availed itself of the privilege of doing business in the forum state is "the *sine qua non* for *in personam* jurisdiction." *Mohasco Indus.*, 401 F.2d at 381–82. *See also Calphalon*, 228 F.3d at 721 ("The purposeful availment prong . . . is essential to a finding of personal jurisdiction.") The "purposeful availment" requirement is satisfied when the defendant's contacts with the forum state "proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State," and when the defendant's conduct and connection with the forum are such that he "should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–7 (1985) (quoting *World–Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980)); *Reynolds v. International Amateur Athletic*

11

*Fed'n*, 23 F.3d 1110, 1116 (6th Cir. 1994). Courts require purposeful availment to insure that "random," "fortuitous," or "attenuated" contacts do not cause a defendant to be haled into a jurisdiction. *Burger King Corp.*, 471 U.S. at 475 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)).

Here, Defendant argues that Plaintiff cannot demonstrate purposeful availment because (1) it was Plaintiff that reached out to Defendant in Pennsylvania to solicit a bid on the Construction Project; (2) all work pursuant to the parties' Subcontract Agreement was completed in Pennsylvania; (3) Defendant was never physically present in the State of Ohio; and (4) and "there are no long-term obligations in Ohio" as a result of the Signed Master Subcontract Agreement and/or Subcontract Agreement. (Doc. No. 15 at 20.) Defendant also asserts that the Signed Master Subcontract Agreement has a choice of law provision that identifies Pennsylvania law as the governing law.[4] (Doc. No. 18 at 10.) *See* Doc. No. 10-5 at PageID# 126.

Plaintiff argues that Defendant's contacts with Ohio satisfy the purposeful availment prong. The entirety of Plaintiff's argument with respect to purposeful availment is as follows: "Defendant cannot claim that his being sued in Ohio was 'random' or 'attenuated.' Rather, a party that surreptitiously and fraudulent revises an agreement and misleads another into signing the agreement,

---

[4] The Court notes that the Standard Master Subcontract Agreement that Plaintiff originally sent to Defendant identified Ohio law as the governing law. (Doc. No. 10-2 at PageID# 114.) Although not expressly alleged in the Amended Complaint, it appears from a comparison of the Standard and Signed Master Subcontract Agreements that Defendant revised the Standard Master Subcontract Agreement to provide for Pennsylvania law as the governing law when he sent it back to Plaintiff for signature in April 2019. Here, Plaintiff does not acknowledge or oppose Defendant's argument that, in analyzing personal jurisdiction, the Court should consider the Pennsylvania choice of law provision in the Signed Master Subcontract Agreement. However, because the Amended Complaint and its attachments could be construed as alleging that this change was procured by fraud, the Court will not factor the choice of law provision into its personal jurisdiction analysis. In any event, "[c]ourts have consistently held that a choice of law provision is not dispositive of the issue of a court's jurisdiction." *Commercial Metal Forming v. Utilities Optimization Group, LLC*, 2011 WL 5023265 at * 5 (N.D. Ohio Oct. 19, 2011).

12

should reasonably be expected to be sued. That is what happened here."[5] (Doc. No. 16 at 18.) Plaintiff did not submit any affidavits in support of its argument, resting instead on the allegations in the Amended Complaint and the attachments thereto.

The Sixth Circuit has held that the mere existence of a contract between a nonresident defendant and a resident, standing alone, is not sufficient to confer personal jurisdiction over a defendant. *See, e.g., Calphalon*, 228 F.3d at 722; *Burnshire Dev., LLC*, 198 Fed. Appx. at 431. *See also Jarmoszuk v. Farm Credit of Florida*, 2013 WL 3947687 at * 6 (N.D. Ohio July 31, 2013). Rather, the court's focus in determining purposeful availment should be on the "*quality* rather than the *quantity* of the contacts," as well as the "*duration* of the [parties'] relationship." *Calphalon*, 228 F.3d at 722. In this regard, the nature and extent of the parties' prior negotiations and future consequences, along with the parties' actual course of dealing, should be considered. *See Burger King*, 471 U.S. at 479.

For the following reasons, the Court finds that Plaintiff has not demonstrated that Defendant's contacts with Ohio are sufficient to rise to the level of purposeful availment. Defendant declares (and Plaintiff does not dispute) that he does not conduct business in Ohio; contract to supply services or goods in Ohio; derive substantial revenue from goods used or consumed or services rendered in Ohio; own real property in Ohio; or contract to insure any risk in Ohio. (Doc. No. 14-1.) Moreover, it is undisputed that it was Plaintiff that solicited Defendant to bid on the Construction Project. It is further undisputed that, when negotiating the Master Subcontract Agreement and Subcontract Agreement, Defendant did not travel to Ohio and that both agreements were executed by Defendant in

---

[5] Plaintiff does not argue that the purposeful availment prong is satisfied either by Defendant's issuance of a notice of intent to lien the project, or by Defendant's alleged Lanham Act violations. Thus, the Court deems these issues waived and does not address them herein.

Pennsylvania. Moreover, it is undisputed that the agreements herein involved a single construction project located outside the forum state; i.e., in Pennsylvania. Finally, Plaintiff has not alleged that the parties' agreements have given rise to any continuing obligations or responsibilities aside from this sole project.

The only contacts with Ohio that Plaintiff has identified in support of personal jurisdiction are a handful of emails and phone calls (as well as the submission of the Signed Master Subcontract Agreement via the internet) that occurred between the parties over the span of a few months in late 2018 and early 2019. However, under very similar circumstances, the Sixth Circuit has rejected the argument that such limited contacts are sufficient to show purposeful availment. For example, in *Kerry Steel, Inc. v. Paragon Industries, Inc.,* 106 F.3d 147 (6th Cir. 1997), the plaintiff, a Michigan steel service center, approached the defendant, an Oklahoma pipe fabricator, with an offer to sell it approximately $300,000 worth of steel coils. The defendant accepted the offer by telephone, following negotiations conducted via telephone and facsimile machine. *Id*. at 148. Purchase orders for the coils were sent to the plaintiff in Michigan. *Id*. After taking possession of the goods at a warehouse in Illinois, the defendant refused to pay the full purchase price because of alleged nonconformity with agreed quality standards. *Id*.

Based on these facts, the Sixth Circuit found that plaintiff had failed to make a *prima facie* showing of personal jurisdiction, explaining as follows:

> The mere fact that [nonresident defendant] Paragon entered into a contract with a Michigan corporation does not mean that Paragon purposefully availed itself of the "benefits and protections" of Michigan law. As the Court explained in *Burger King*, 471 U.S. at 478, 105 S.Ct. at 2185, "an individual's contract with an out-of-state party alone" cannot "automatically establish minimum contacts." *See also CompuServe*, 89 F.3d at 1265 ("merely entering into a contract ... would not, without more, establish sufficient minimum contacts").

14

> It is immaterial that Paragon placed telephone calls and sent faxes to Kerry Steel in Michigan. To borrow language employed by this court in *LAK*, 885 F.2d at 1301, "[t]he telephone calls and letters on which the plaintiff's claim of jurisdiction primarily depends strike us as precisely the sort of 'random,' 'fortuitous' and 'attenuated' contacts that the *Burger King* Court rejected as a basis for haling non-resident defendants into foreign jurisdictions." *Id.* at 1300. *See also Scullin Steel Co. v. National Ry. Utilization Corp.*, 676 F.2d 309, 314 (8th Cir.1982) ("The use of interstate facilities (telephone, the mail), the making of payments in the forum state, and the provision for delivery within the forum state are secondary or ancillary factors and cannot alone provide the 'minimum contacts' required by due process").
>
> Not only was there no "reaching out" by Paragon to the Michigan plaintiff, we have been given no reason to believe that Paragon intended to establish "continuing relationships and obligations" in Michigan. *Burger King*, 471 U.S. at 473, 105 S.Ct. at 2182–83. This is not a case like *Lanier v. American Bd. of Endodontics*, 843 F.2d 901, 911 (6th Cir.), cert. denied, 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988), where the court upheld Michigan's exercise of jurisdiction over an out-of-state defendant on the ground that the "object of the [defendant's] contacts with Michigan [was] to have ongoing, far-reaching consequences in the Michigan dental services market." The purchase agreement between Paragon and Kerry Steel represents nothing more than an isolated transaction, as far as the record discloses. There is no indication in the record that Paragon intended to create an ongoing relationship in Michigan with Kerry Steel.
>
> We note also that Kerry Steel has alleged no facts connecting either the subject matter of the contract or its performance to the State of Michigan. The *Mohasco* court found it significant that the defendant's activities had "a realistic impact on the commerce of that state." 401 F.2d at 382. No such impact existed in the case at bar. Paragon took possession of the steel coils in Illinois, title passed there, and Kerry Steel does not even assert that the coils were ever located in Michigan. Kerry Steel's Michigan bank account did suffer, to be sure, "but the locus of such a monetary injury is immaterial, as long as the obligation did not arise from 'a privilege the defendant exercised in [the forum state].'" *LAK*, 885 F.2d at 1303, quoting *Hanson*, 357 U.S. at 252, 78 S.Ct. at 1239.

*Id*. at 150-151. The undisputed facts in the instant case are strikingly similar to *Kerry Steel, supra*. As in *Kerry Steel*, no facts connect the subject matter or performance of the parties' agreements in the instant case to Ohio. Moreover, Plaintiff herein reached out to Defendant in Pennsylvania to bid on the Construction Project, and there is no allegation that Defendant intended to establish "continuing relationships and obligations" in Ohio. Like the purchase agreement in *Kerry Steel*, the

15

parties' agreements herein represent "nothing more than an isolated transaction, as far as the record discloses." *Kerry Steel*, 106 F.3d at 151. Under these circumstances, the Court finds that Plaintiff has failed to make a *prima facie* showing that Defendant purposefully availed himself of the privilege of acting in Ohio or causing a consequence in this State.[6]

Plaintiff appears to argue, however, that Defendant's alleged act of fraudulently procuring the Master Subcontract Agreement is sufficient, in and of itself, to demonstrate purposeful availment. Although not cited by either party, the Court notes that the Sixth Circuit has found that a nonresident defendant's allegedly fraudulent communications into the forum state may be sufficient to confer personal jurisdiction under certain circumstances. For example, in *Serras v. First Tennessee Bank Nat'l Assn*., 875 F.2d 1212 (6th Cir. 1989), the Michigan plaintiffs purchased a restaurant located in Tennessee from a Tennessee defendant. In that case, plaintiffs alleged that the defendant made fraudulent representations regarding the value of the property and that, based upon those representations, they agreed to enter into a loan for the purchase of the restaurant. Plaintiffs further alleged that defendant's fraudulent representations exposed them "to harms that would affect them not only as owners of Tennessee property, but also as residents of Michigan." *Id*. at 1218. Based on the affidavits and pleadings presented, the Sixth Circuit found that purposeful availment was present as the "defendant actually travelled to [the forum state] to solicit [plaintiffs'] business, and actually made fraudulent misrepresentations while in [the forum state]." *Id*. at 1217.

---

[6] The Court finds the instant case to be distinguishable from *Commodigy OG Vegas Holdings LLC v. ADM Labs,* 2019 WL 5552606 (N.D. Ohio Oct. 28, 2019). In that case, defendant's contacts with the Ohio plaintiff were more extensive and included sending samples to the plaintiff in Ohio, purchasing supply bags from the plaintiff in Ohio, and receiving payment from plaintiff from an Ohio bank. *Id*. at * 5. Moreover, in *Commodigy*, the Court noted that defendant directed activity into Ohio "for the purpose of initiating and sustaining a continuing business relationship there." *Commodigy OG Vegas Holdings,* 2019 WL 5552606 at * 6. As noted above, there is no allegation of any continuing obligations or relationship between the parties herein, or any purpose or intent on the part of Defendant to initiate or sustain any such continuing obligations or relationships.

16

Similarly, in *Neal v. Janssen*, 270 F.3d 328 (6th Cir. 2001), the Sixth Circuit found personal jurisdiction existed where the nonresident defendant was found to have directed false information to the plaintiffs in the forum state of Tennessee regarding the commission for the sale of a dressage horse named Aristocrat, which was boarded in the Netherlands. Specifically, the defendant (who was plaintiffs' agent in selling the horse) represented to the plaintiffs that he had found a buyer that would pay $312,000 for Aristocrat. *Id.* at 330. Based on this representation, plaintiffs accepted the offer. *Id.* Plaintiffs subsequently learned, however, that the buyer had actually paid defendant $480,000. *Id.* Although the defendant never visited the forum state, the Sixth Circuit found that representations made to the forum state residents were pivotal, noting that "the [defendant's] actions of sending false information into [the forum state] by phone and fax had foreseeable effects in [the forum state] and were directed at individuals in [the forum state]." *Id.* at 332. In that case, the Sixth Circuit noted that the jury had found plaintiffs had been damaged by defendant's misrepresentations, awarding them $250,000 in compensatory damages. *Id.* at 331.

The Court finds the above cases to be distinguishable from the instant case. In both *Serras* and *Neal,* plaintiffs alleged that the nonresident defendants made fraudulent misrepresentations and that, based on those misrepresentations, plaintiffs suffered harm in the forum state that was foreseeable to defendants. Here, Plaintiff does not sufficiently allege that it was actually harmed by Defendant's allegedly fraudulent conduct. While the Amended Complaint avers generally that "O'Brien has been damaged in an amount in excess of $75,000," Plaintiff does not allege any facts explaining how Plaintiff was damaged by Defendant's failure to disclose his changes to the Master Subcontract Agreement. Specifically, Plaintiff fails to either (1) identify the changes that were made to the Master Subcontract Agreement; and/or (2) allege how Plaintiff was harmed by those changes.

17

Plaintiff does not allege that Defendant breached the Signed Master Subcontract Agreement and/or the Subcontract Agreement in any way, much less in a manner that implicates the provisions of the parties' agreement that Defendant allegedly fraudulently changed. Reading the Amended Complaint as a whole and construing all inferences in Plaintiff's favor, the Court finds that Plaintiff simply does not sufficiently allege that it suffered any harm (in Ohio or otherwise) as a result of Defendant's allegedly fraudulent conduct.[7] Therefore, the Court finds that *Serras* and *Neal* are distinguishable[8] and further that, under the particular circumstances presented, Plaintiff has failed to make a *prima facie* showing of purposeful availment.

Accordingly, and for all the reasons set forth above, the Court finds that Plaintiff has failed to demonstrate that Defendant purposefully availed himself of the privilege of acting in Ohio or causing a consequence in this State. As a result, analysis of the second and third prongs of the *Mohasco* test is unnecessary. *See LAK, Inc. v. Deer Creek Enter.*, 885 F.2d 1293, 1303 (6th Cir.1989) ("The plaintiff having failed to pass the 'purposeful availment' test, we need not dwell on the other criteria

---

[7] Although not cited or expressly argued by either party, the Court notes that a plaintiff may sometimes satisfy purposeful availment through the effects test enunciated in *Calder v. Jones*, 465 U.S. 783 (1984). Under the effects test, a plaintiff must show that the defendant: "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Stolle Mach. Co., LLC v. RAM Precision Indus.*, 2011 WL 6293323, at *8 (S.D. Ohio Dec.15, 2011). *See also Thompson v. Moore*, 2009 WL 3378242 at * 2 (N.D. Ohio Oct. 15, 2009). Even if the effects test had been raised by the parties herein, Plaintiff's allegations would fail to meet this test, as the Amended Complaint does not sufficiently allege that Defendant's fraudulent conduct caused harm in the forum state.

[8] The Court also notes that the plaintiffs in *Serras* and *Neal* alleged fraud claims, whereas Plaintiff herein alleges a claim for fraud in the execution/fraud in the factum. While the Court does not reach the merits of this claim, it is worth noting that Ohio courts have held that a release is not void for fraud in the execution where there was a misrepresentation of the contents of that agreement but the releasor failed to take the opportunity to read and understand the document before execution. *See Haller v. Borror Corp.*, 552 N.E.2d 207 (Ohio 1990). *See also Boyd v. Allied Home Mortg. Capital Corp.*, 523 F.Supp.2d 650, 655 (N.D. Ohio 2007). As the Ohio Supreme Court has explained, "[a] person of ordinary mind cannot say that he was misled into signing a paper which was different from what he intended to sign when he could have known the truth by merely looking when he signed. * * * If a person can read and is not prevented from reading what he signs, he alone is responsible for his omission to read what he signs." *Haller*, 552 N.E.2d at 210. Here, Plaintiff does not allege that it did not have the opportunity to read and understand the Signed Master Subcontract Agreement before executing it.

18

of *Mohasco Industries*; each criterion represents an independent requirement, and failure to meet any one of the three means that personal jurisdiction may not be invoked.") *See also Filtrexx Intern., LLC*, 2013 WL 587582 at * 12 (same).

**IV. Conclusion**

For all the foregoing reasons, Defendant's Motion to Dismiss (Doc. No. 14) is GRANTED to the extent it seeks dismissal on the basis of lack of personal jurisdiction. Defendant's Motion is DENIED AS MOOT to the extent it seeks dismissal for lack of subject matter jurisdiction and failure to state a claim. Defendant's Motion to Transfer Venue (Doc. No. 13) is DENIED AS MOOT.

**IT IS SO ORDERED.**

Date: March 12, 2020

 *s/Pamela A. Barker*
PAMELA A. BARKER
U. S. DISTRICT JUDGE